IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TERRY BURNS,** | : | **CIVIL ACTION NO. 1:04-CV-2793** |
| | : | |
| Plaintiff | : | **(Judge Conner)** |
| | : | |
| v. | : | |
| | : | |
| **JOHN E. POTTER**, Postmaster | : | |
| General, U.S. Postal Service, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

This is an employment discrimination action filed by Terry Burns ("Burns"), a former participant in the United States Postal Service Associate Supervisor Program. The defendant, John E. Potter, is the Postmaster General for the United States Postal Service ("Postal Service"). In his complaint, Burns alleges that the Postal Service discriminated against him on the basis of gender and age. Presently before the court is defendant's motion for summary judgment (Doc. 12). For the reasons that follow, the motion will be granted.

**I.    Statement of Facts**[1]

The Associate Supervisor Program is "an intense 16 week curriculum of classroom learning, homework, tests, and on-the-job training" designed to prepare Postal Service employees to become supervisors. (Doc. 13 ¶¶ 1, 3; Doc. 27 ¶¶ 1, 3.) In 2001, non-Postal Service employees were invited to participate in the program

---

[1] In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to Burns. See infra Part II.

for the first time.  (Doc. 13 ¶ 2; Doc. 27 ¶ 2.)  Burns, a fifty-three year old non-Postal Service employee, applied for the program.  He underwent a "rigorous selection process consisting of a written examination and a series of oral interviews" before being selected.  (Doc. 13 ¶¶ 14, 16-17, 19; Doc. 27 ¶¶ 14, 16-17, 19.)

In total, seventeen individuals were selected to participate in the program in 2001.  (Doc. 13 ¶¶ 19-20; Doc. 27 ¶¶ 19-20.)  Of these seventeen individuals, thirteen, including Burns, received their training at defendant's Harrisburg facility.  (Doc. 13 ¶ 19; Doc. 27 ¶ 19.)  The four remaining individuals received their classroom training in Harrisburg, but completed their on-the-job training and evaluations at other Postal Service facilities in Pennsylvania.  (Doc. 13 ¶ 20; Doc. 27 ¶ 20.)

### A. Weeks One and Two of the Program

The first two weeks of the Associate Supervisor Program consist entirely of classroom instruction, followed by a written examination to determine whether a candidate should be permitted to continue in the program.  (Doc. 13 ¶¶ 4-5; Doc. 27 ¶¶ 4-5.)  In the instant case, all seventeen participants, including Burns, met as a group for classroom instruction.  (Doc. 13 ¶ 28; Doc. 27 ¶ 28.)  Burns passed his written examination and was permitted to remain in the program.  (Doc. 13, Ex. B at 18.)

Faye Griggs ("Griggs") was the classroom instructor during the first two weeks of the program.  (Doc. 13 ¶ 30; Doc. 27 ¶ 30.)  On the first day of the program, Griggs mistook Burns for a fellow instructor as "he was the only one in a shirt and tie."  (Doc. 13 ¶ 32; Doc. 27 ¶ 32.)  Griggs commented on Burns' clothing, which

2

Burns initially took as a compliment.  (Doc. 13 ¶ 33; Doc. 27 ¶¶ 33-34.)  At some point, Burns told Griggs, "My wife lays out my clothes on the bed and when I get done taking a shower and stuff I put them on."  (Doc. 13, Ex. B at 23.)  In response to this, Griggs said, "Oh, your wife dresses you."  (Doc. 13, Ex. B at 23.)  According to Burns, Griggs repeated this comment several times throughout the program, which made it offensive.[2]  (Doc. 13, Ex. B at 24; Doc. 17 ¶¶ 33-34.)  In addition, Griggs repeatedly referred to Burns' all-male group as the "testosterone group" and commented that she was unsure whether she would want to "start all over again" as a supervisor at her age, which was fifty-one.  (Doc. 13, Ex. B at 163; Doc. 13 ¶ 39; Doc. 27 ¶ 39.)  Finally, after giving Burns several of his evaluations, Griggs allegedly stated, "We had some concerns about how you would fit into the class because of your age, but I don't think it's going to be a problem now."  (Doc. 13 ¶ 64; Doc. 27 ¶ 64.)

At the end of the second week, the thirteen participants in the Harrisburg facility were broken into two groups based upon each participant's preferred work schedule.  (Doc. 13 ¶¶ 23-26; Doc. 27 ¶¶ 23-26.)  The groups were comprised as follows:

---

[2] Burns acknowledged in deposition testimony that Griggs' comment regarding his dress "had nothing to do with [his] gender."  (Doc. 13, Ex. C at 49.)

| Group A | Group B |
|---|---|
| Lan Walters (male, age 31) | Rob Wicks (male, age 40) |
| Michael Battle (male, age 37) | Frank Thompson (male, age 32) |
| George Daugherty (male, age 46) | Rodney Rowe (male, age 32) |
| Daron Depto (male, age 33) | David Thomas (male, age 48) |
| Patrick King (male, age 49) | John Smith (male, age 36) |
| Terry Burns (male, age 53) | John Chatmon (female, age 35) |
| | Jayme Garner (female, age 25) |

(Doc. 13 ¶ 27; Doc. 27 ¶ 27.)

### B. Weeks Three through Eight of the Program

In weeks three through eight of the program, classroom instruction is supplemented with on-the-job training and homework assignments. (Doc. 13 ¶ 6; Doc. 27 ¶ 6.) Candidates also receive weekly evaluation scores ranging from zero to four.[3] (Doc. 13 ¶ 7; Doc. 27 ¶ 7.) In the instant case, Troy Seanor ("Seanor") provided classroom instruction and prepared evaluations for week three of the program.[4] (Doc. 13 ¶ 49; Doc. 27 ¶ 49.) From weeks four through six, Carrol Cannon ("Cannon"), Joanne Smith, and Barbara Murray ("Murray") provided instruction. (Doc. 13 ¶¶ 52-57; Doc. 27 ¶¶ 52-57.) Despite the fact that she was not an instructor,

---

[3] The evaluations contain ten sub-parts on which each candidate is graded, and the scores for each sub-part are then averaged to arrive at the overall score. (Doc. 13 ¶¶ 8-9; Doc. 27 ¶¶ 8-9.)

[4] Burns alleges that Seanor gave each of the candidates in the all-male group an evaluation score of two "with the sole and improper purpose of depressing scores and increasing the probability that members of the male group would not pass." (Doc. 1 ¶¶ 32, 34; Doc. 4 ¶ 34.) The court finds no record support for Burns' conclusions. To the contrary, Seanor graded *all* thirteen Harrisburg participants with a two, regardless of gender or group membership. (Doc. 13 ¶ 51; Doc. 27 ¶ 51; Doc. 13, Ex. C at 36.)

Griggs prepared the evaluations for weeks four through six. Griggs elicited input from Cannon but not from Smith or Murray. (Doc. 13 ¶ 58; Doc. 27 ¶ 58.) Murray continued to provide instruction during weeks seven and eight. (Doc. 13 ¶ 66; Doc. 17 ¶ 66.) Murray also prepared the evaluations for those two weeks. Murray was instructed that no one should receive a score of four, so Murray awarded scores ranging from 3.4 to 3.9 for weeks seven and eight. (Doc. 13 ¶¶ 67-68; Doc. 27 ¶¶ 67-68.) Murray awarded Burns a score of 3.6 for weeks seven and eight. (Doc. 13, Ex. D at 13.) Averaging these scores with Burns' prior weekly scores of 2.0, 2.8, 2.5, and 2.7 resulted in Burns' final evaluation score of 2.9. (Id.)

After the eighth week, candidates must take a second written examination, which is scored from zero to four.[5] (Doc. 13 ¶ 10; Doc. 27 ¶ 10.) Each candidate's test score is then added to his or her average weekly evaluation score to arrive at a combined score. (Doc. 12 ¶ 13; Doc. 27 ¶ 13.) A candidate must receive a combined score of five or higher to continue in the program.[6] (Doc. 13 ¶ 13; Doc. 27 ¶ 13.)

---

[5] The examination was scored by the National Testing Administration Center ("NTAC") in Merrifield, Virginia. (Doc. 13 ¶¶ 11, 72.) It was proctored by Richard Corrado ("Corrado"), a Postal Service employee. (Doc. 13 ¶ 70.) After the examination was administered, Corrado placed the test booklets and answer sheets in a sealed, time-stamped box and mailed them to the NTAC facility. (Doc. 13, Ex. K ¶¶ 7-10.)

[6] Burns maintains that he did not learn of the combined score requirement until late in the program. (Doc. 27 ¶ 80.) However, the participant's guide states, "Students must accumulate . . . a combined total of five points from the Week 8 examination and the average weekly On-Site Trainer Evaluations." (Doc. 13, Ex. A at 5-1.)

In total, seven of the thirteen Harrisburg participants successfully completed the program in 2001.[7] Burns was not among them. (Doc. 13 ¶ 79; Doc. 27 ¶ 79.) Burns was asked to leave the program because he received a combined score of 4.9. (Doc. 13, Ex. B at 13-14; Doc. 13 ¶¶ 76, 78; Doc. 27 ¶ 78.) Nevertheless, Burns' final evaluation score of 2.9 was the second highest among the Harrisburg participants, and Burns received a passing score of 2 on his final examination. (Doc. 1 ¶ 6; Doc. 4 ¶ 6.) Burns believed that his final examination score had been calculated incorrectly, so he requested permission to review his examination. His request was refused because the Postal Service considers the examination questions confidential work product. (Doc. 27 ¶ 76; Doc. 13 ¶ 95.)

Burns asserts that there were numerous irregularities in the program's administration and that these irregularities were prompted by a discriminatory animus. First, the evaluations for weeks four through six were performed after the sixth week, rather than once weekly as required by the program. Burns says this reduced his ability to improve between evaluations. (Doc. 13 ¶ 63; Doc. 27 ¶ 63; Doc. 13, Ex. B at 30.) Second, Griggs and Cannon decided that none of the candidates in Harrisburg deserved an evaluation score of four. However, the other candidates in the region, who were not evaluated by Griggs and Cannon, received scores of four. (Doc. 13 ¶¶ 61, 67; Doc. 27 ¶¶ 61, 67.) Third, Griggs conducted evaluations when she was neither an on-site trainer nor a classroom instructor, as

---

[7] Of the successful participants, two were from Burns' group, five were male, and two were age forty or older. (Doc. 13 ¶ 79; Doc. 27 ¶ 79.)

required by the program.  (Doc. 27 ¶¶ 7, 49, 58; Doc. 13 ¶ 58.)  Fourth, there were "numerous and uncorrected mathematical errors" in the evaluation score calculations.  (Doc. 27 ¶¶ 8-9, 12, 74.)  Fifth, the candidates were taught using Harrisburg-specific materials that were not required by the national program.[8]  (Doc. 13 ¶¶ 29-30; Doc. 27 ¶¶ 29-30.)  Finally, the candidates were not permitted to review their examinations to determine if any answers had been "changed or altered."  (Doc. 27 ¶ 76.)

### D. Procedural History

Burns filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), and a hearing was held on March 4, 2004.  (Doc. 13 ¶ 87; Doc. 27 ¶ 87.)  The Administrative Law Judge ruled in favor of defendant.  (Doc. 13 ¶¶ 88-90; Doc. 27 ¶¶ 88-90.)  On December 23, 2004, Burns filed the instant action pursuant Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-2(a), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621.[9]  (See Doc. 1.)  Specifically, Burns contends that defendant discriminated against him on the basis of gender and age.  (See Doc. 1.)  Defendant filed the instant motion for summary judgment (Doc. 12), alleging that Burns has failed to establish a prima

---

[8] Burns acknowledges that all materials required by the national program were also provided.  (Doc. 13, Ex. B at 46.)  Burns also acknowledges that all thirteen Harrisburg participants were provided the same materials.  (Doc. 13, Ex. C at 35.)

[9] While Burns' complaint does not explicitly set forth a claim under the ADEA, it contains allegations of age discrimination which can only be vindicated under the ADEA.

facie case of discrimination. The motion has been fully briefed and is ripe for disposition.

**II.   Standard of Review**

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact," and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(c). It places the burden on the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

**III.   Discussion**

Burns alleges that defendant discriminated against him on the basis of gender and age. Specifically, Burns alleges that he was subjected to disparate treatment and to a hostile work environment. The court will address these claims *seriatim.*

### A.     <u>Disparate Treatment</u>

Burns alleges that he was subjected to disparate treatment in training, evaluation and testing because of his age and gender.[10] To withstand a motion for summary judgment on a disparate treatment claim, a plaintiff must establish that his or her "protected trait played a role in the employer's decision-making process and had a determinative influence on the outcome of that process." <u>Ulitchney v. Potter</u>, No. 3:04CV991, 2006 WL 1722391, at *2 (M.D. Pa. 2006) (quoting <u>Monaco v. Amer. Gen. Assurance. Co.</u>, 359 F.3d 296, 300 (3d Cir. 2004)). A plaintiff may meet this burden with either direct evidence, <u>see</u> <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 288 (1989) (O'Connor, J., concurring), or circumstantial evidence, <u>see</u> <u>McDonnell</u>

---

[10] Gender discrimination is proscribed by Title VII, which provides, in pertinent part, as follows:

> It shall be an unlawful employment practice for an employer --
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, *sex*, or national origin.

42 U.S.C. § 2000-e(2) (emphasis added). The ADEA uses similar language to proscribe discrimination against individuals age forty and over. <u>See</u> 29 U.S.C. § 621; <u>see also</u> <u>Carr v. Borough of Elizabeth</u>, 121 F. App'x 459, 460 (3d Cir. 2005) ("Title VII and the ADEA are similar in structure and purpose."). The analysis that follows applies to both Title VII and ADEA claims.

Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  In the instant case, Burns has not provided direct evidence of discrimination;[11] therefore, the court will examine his claims using the three step burden-shifting analysis set forth in McDonnell Douglas.

Under McDonnell Douglas, a plaintiff must first establish a prima facie case of discrimination by proving the following elements:  (1) the plaintiff is a member of a protected class,[12] (2) the plaintiff was qualified for the position he held or sought, (3) the plaintiff suffered an adverse employment action, and (4) the circumstances of the adverse employment action give rise to an inference of discrimination.  Johnson v. Keebler-Sunshine Biscuits, Inc., No. 06-3219, 2007 WL 215801, at *2 (3d Cir. 2007); Connors v. Chrysler Fin. Corp., 160 F.3d 971, 974 (3d Cir. 1998).  Once the *prima*

---

[11] Direct evidence is "evidence that proves an ultimate fact in the case without any process of inference." Woodson v. Scott Paper Co., 109 F.3d 913, 930 (3d. Cir. 1997).  An employer who discriminates "will almost never announce a discriminatory animus or provide employees or courts with direct evidence of discriminatory intent." Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir. 1999). Therefore, a plaintiff who wishes to establish a prima facie case of discrimination using direct evidence "faces a high hurdle." Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998).  The court has found no evidence of record to suggest that Burns has cleared this hurdle in the instant action.  At most, Griggs' derogatory statements evidence an awareness of Burns' age and gender.  The statements do not suggest that defendant's employment decisions were based upon Burns' age or gender.  Contrast Salkovitz v. Pioneer Elecs., Inc., 188 F. App'x 90, 93 (3d Cir. 2006) (holding that referring to employee as a "human antique" was insufficient to constitute direct evidence of discrimination), with Fakete v. Aetna, Inc., 308 F.3d 335, 336 (3d Cir. 2002) (holding that being told that the defendant was "looking for younger single people" was sufficient to constitute direct evidence of discrimination).

[12] The protected class element has been extended to reach cases of "reverse discrimination," wherein a member of a majority group alleges that he or she was discriminated against in favor of a member of a minority group.  Iadimarco, 190 F.3d at 158.  Burns' claim of gender discrimination falls into this category.

*facie* case is established, the burden shifts to the defendant to articulate some "legitimate, nondiscriminatory reason" for the plaintiff's treatment. Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir. 1999) (citing McDonnell Douglas, 411 U.S. at 802); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997). The defendant's burden to prove a legitimate non-discriminatory reason is "relatively light." Johnson, 2007 WL 215801, at *3. The defendant is only required to prove that its actions could have been motivated by the proffered legitimate, nondiscriminatory reason; proof of actual causation is not required. Iadimarco, 190 F.3d at 157. Once the defendant has met its burden, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination." Johnson, 2007 WL 215801, at *2. The plaintiff may meet this burden by presenting evidence from which a reasonable factfinder could "either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Keller, 130 F.3d at 1108.

Turning to the prima facie case, defendant concedes that Burns was a member of a protected class and that he suffered an adverse employment action. (Doc. 12 ¶ 10.) However, defendant contends that Burns was not qualified for the position because he did not receive the required combined score of five. See Straining v. AT&T Wireless Servs., Inc., 144 F. App'x 229, 232 (3d Cir. 2005) (holding that job applicant who did not earn passing scores on required examination was not

"qualified" for the position). Burns counters that he would have received the required combined score absent: (1) Griggs' attempts to depress his evaluation scores, and (2) the improper grading of his final examination.[13] Given Burns' argument that his score was depressed because of discrimination, the court cannot find as a matter of law that Burns was not qualified for the position.

Next, the court must determine whether the circumstances of Burns' termination give rise to an inference of discrimination. A plaintiff can establish an inference of discrimination where he or she was "treated differently than similarly-situated, non-protected employees." Johnson, 2007 WL 215801, at *2. Similarly-situated employees are those who "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002); see also Red v. Potter, No. 05-5256, 2006 WL

---

[13] Burns further contends that he was qualified because he successfully completed the program according to the requirements of the participant's guide. (Doc. 27 ¶ 13.) The participant's guide states, "Successful course completion will be determined by passing scores on the three objective tests (taken Weeks 1, 2 and 8), successful completion of the on-the-job assignments, and satisfactory evaluations from on-the-job trainers." (Doc. 13, Ex. A at 1-5.) Defendant concedes that Burns met each of these prerequisites. However, the participant's guide also states, "Students must accumulate . . . a combined total of five points from the Week 8 examination and the average weekly On-Site Trainer Evaluations." (Doc. 13, Ex. A at 5-1.) It is not for the court to determine "whether the employer made the best, or even a sound, business decision." Keller, 130 F.3d at 1109. Burns was on notice of this additional requirement, and the court will not second-guess defendant's decision to require strict compliance.

3349563, at *2 (3d Cir. 2006) (stating that "in order to show that an employee is 'similarly situated,' all of the relevant aspects of employment need to be nearly identical). In the action *sub judice*, the thirteen candidates who were trained in Harrisburg are similarly-situated.[14]

To establish an inference of both gender and age discrimination, Burns points to a number of "irregularities" in the training, evaluation and testing process which he says evidenced a discriminatory intent. These irregularities included the use of substituted materials, the tardy performance of evaluations, the alleged mathematical errors in evaluation scores, Griggs' involvement with the evaluation process, Griggs' instruction not to award scores of four, and the alleged alteration of test results. While Burns has offered proof of each of these irregularities, he has failed to allege that he was "treated differently than similarly-situated, non-protected employees" with respect to these irregularities. See Johnson, 2007 WL 215801, at *2. Even viewing the evidence in the light most favorable to Burns, the court finds that all similarly-situated candidates were subjected to the same materials, evaluations, score calculations, and examinations. Burns argues that Group A occasionally received different treatment than Group B (see Doc. 23 at 2-3); however, the groups were not intentionally divided along age or gender lines,

---

[14] Burns argues that the four candidates who were trained outside Harrisburg should also be considered similarly-situated. (Doc. 23 at 4-5.) The court finds sufficient "differentiating or mitigating circumstances" to distinguish these four candidates from Burns. For example, the four additional candidates conducted their on-site training in different locations and were evaluated by different supervisors than Burns. See Ogden, 226 F. Supp. at 603.

and any difference in treatment was *de minimis* at best.  There is ample evidence that all examinations were scored by a neutral third-party, and Burns has not produced any evidence that defendant's employees had the motive or opportunity to alter his test results.  Likewise, all participants who did not achieve a combined score of five were dismissed from the program irrespective of age or gender.[15]

To establish an inference of gender discrimination, Burns also relies upon: (1) his assignment to an all-male group, (2) Griggs' statement regarding Burns' clothing, and (3) Griggs' references to the "testosterone group."  The court finds that these allegations fail to establish an inference of gender discrimination.  Burns concedes that he chose his group assignment based upon his desired work schedule and that defendant did not intentionally create an all-male group.  Additionally, Griggs' statements, at most, amount to "the sporadic use of abusive language [and] gender-related jokes" that fall short of the threshold of actionability under Title VII. Kay v. Independence Blue Cross, 142 F. App'x 48, 51 (3d Cir. 2005).  In fact, Burns admits that Griggs' statement regarding his clothing "had nothing to do with [his] gender."  (Doc. 13, Ex. C at 49.)  Furthermore, Griggs' references to the "testosterone group" may have been in poor taste, but they do not evidence a

---

[15] Burns suggests that a statistical analysis of the individuals who were dismissed from the program provides further evidence of discrimination.  (Doc. 23 at 6-8.)  The court cannot rely upon these suggested results because the small sample size makes them statistically insignificant.  See Shieh v. Lyng, 710 F. Supp. 1024, 1033 (E.D. Pa. 1989) (finding that the promotion of five individuals outside of the plaintiff's protected class could not support an inference of discrimination because it was "statistically insignificant").

general intent to discriminate against men.  See Miller v. Berry Metal Co., 80 F. App'x 245, 248 (3d Cir. 2003) (finding that comments that were "likely made in jest" do not give rise to an inference of discrimination); Verney v. Dorado, 872 F. Supp. 188, 197 (M.D. Pa. 1995) (holding that "continual references to a woman's breasts" reflected poor judgment but did not prove discrimination); Yon v. SEPTA, No. Civ. A. 01-5231, 2003 WL 22597614, at *16 (E.D. Pa. 2003) (finding that "passing references to PMS and hormones . . . do not create an inference of gender discrimination).

To establish an inference of age discrimination, Burns also relies upon: (1) Griggs' statement that she would not want to start over as supervisor at her age, and (2) Griggs' statement that she was initially concerned about how Burns would fit in with the group because of his age.  "Stray remarks by . . . decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  Windfelder v. The May Dep't Stores Co., 93 F. App'x 351, 355 (3d Cir. 2004).  In the action *sub judice*, the court finds that Griggs was acting as a decisionmaker because she evaluated the candidates for a three-week period.  However, Griggs' statements were at best stray remarks that did not evidence a general disfavor toward individuals over age forty.  The  inference of age discrimination is further rebutted by the fact that Griggs was herself over the age of  forty.  See Sherrod v. Booker T. Washington, Civ. A. No. 04-208, 2006 WL 2707317, at 7 (W.D. Pa. 2006) (holding that inference of discrimination was rebutted where individual who made allegedly racist comments was member

15

"of the same protected class as plaintiff"); Dungee v. Northeast Foods, Inc, 940 F. Supp. 682 n.3 (D.N.J. 1996) (finding that decision-maker's membership in plaintiff's protected class "weakens any compelling evidence of age discrimination").

For the foregoing reasons, the court finds insufficient evidence to establish an inference of discrimination on the basis of gender or age. Because Burns has failed to establish a prima facie case of discrimination, defendant's motion for summary judgment will be granted.[16]

### B.   Hostile Work Environment

Defendant contends that Burns' hostile work environment claim is barred because it was never presented to the EEOC. (Doc. 12 ¶ 29.) "[E]xhaustion of administrative procedures is a precondition to the maintenance of a federal

---

[16] Assuming *arguendo* that Burns had established a prima facie case of discrimination, his claim would still fail for lack of evidence of pretext. Defendant has produced sufficient evidence that Burns was terminated for the legitimate non-discriminatory reason that he did not achieve the requisite score to proceed in the program. (See Doc. 12 ¶ 21.) Burns argues that the proffered reason is pretextual because defendant chose to adhere to the five point combined score requirement, while repeatedly ignoring other requirements of the program. (Doc. 19 at 6-8.) Proving pretext places a "difficult burden" on the plaintiff. Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 386 (3d Cir. 1999). The plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." Keller, 130 F.3d at 1009. It is not for the court to second-guess defendant's decision to adhere strictly to the five point combined score requirement. See Kautz v. Met-Pro Corp., 412 F.3d 463, 471 (3d Cir. 2005) ("[T]he mere fact that a different, perhaps better, method of evaluation could have been used is not evidence of pretext."); Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 528 (3d Cir. 1992) (noting that the court does not act as "member[] of an employer's promotion board or committee"). Burns has presented no evidence to suggest that defendant's adherence to the score requirement was motivated by discriminatory animus. Absent such evidence, Burns cannot meet his burden to prove pretext.

employment discrimination civil lawsuit." Laye v. Potter, No. 02:04cv0046, 2006 WL 1617777, at *4 (W.D. Pa. 2006) (citing Brown v. Gen. Servs. Admin., 425 U.S. 820, 832 (1976)).  When a plaintiff who has presented a claim to the EEOC seeks to present a different claim in federal court, the court must determine whether the new claim is "like or reasonably related to the allegations of the EEOC charge." Laye, 2006 WL 1617777, at *4 (citing Antol v. Perry, 82 F.2d 1291 (3d Cir. 1996)).

In the action *sub judice*, Burns alleges that he was subjected to sexual harassment which created a hostile work environment.  (Doc. 19 at 9.)  Several courts have dismissed a claim of sexual harassment where the underlying EEOC complaint contained a gender discrimination but not a sexual harassment claim. See Sandom v. Travelers Mortg. Servs., Inc., 752 F. Supp. 1240, 1246-48 (D.N.J. 1990); Torriero v. Olin Corp., 684 F. Supp. 1165, 1170 (S.D.N.Y. 1988); Zalewski v. M.A.R.S. Enterprises, Ltd., 561 F. Supp. 601 (D. Del. 1982).  Burns' allegations of gender discrimination "could not reasonably have been expected to lead to an investigation of" Burns' hostile work environment claim.[17]  See Hsing-Chow Hwang v. U.S. Dept. of Defense, No. Civ. 04-1663, 2006 WL 1084161, at *4 (D.N.J. 2006) (quoting Shaver v. Travelers Mortgage Serv., Inc., 936 F. Supp. 313, 319 (W.D. Pa.

---

[17] In his pre-hearing statement before the EEOC, Burns stated, "The fact that [Griggs] admitted that she recalled the phrase [testosterone group] being used, and failed to recall any measures to stop such offensive comments further corroborates Mr. Burns' allegations that a *hostile environment* was created and maintained." (Doc. 21, Ex. E at 2 (emphasis added)).  The court finds such a fleeting reference insufficient to put defendant on notice of Burns' intent to bring a hostile environment claim.

17

1996).  Therefore, Burns' hostile work environment claim has been waived for failure to exhaust administrative remedies.

**IV.    Conclusion**

For the foregoing reasons, the court will grant defendant's motion for summary judgment, and this case will be closed.

An appropriate order will issue.

                                            S/ Christopher C. Conner
                                            CHRISTOPHER C. CONNER
                                            United States District Judge

Dated:        February 2, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TERRY BURNS,** | : | **CIVIL ACTION NO. 1:04-CV-2793** |
| **Plaintiff** | : | **(Judge Conner)** |
| v. | : | |
| **JOHN E. POTTER, Postmaster General, U.S. Postal Service** | : | |
| **Defendant** | : | |

## **ORDER**

AND NOW, this 2nd day of February, 2007, upon consideration of the motion for summary judgment (Doc. 12), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. Defendant's motion for summary judgment (Doc. 12) is GRANTED. See FED. R. CIV. P. 56(c).

2. The Clerk of Court is directed to CLOSE this case.

    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge